**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| FANN CONTRACTING, INC., | ) | Case No.: 2:19-cv-00716-GMN |
| | ) | |
| Appellant, | ) | **MEMORANDUM & OPINION** |
| vs. | ) | |
| | ) | Appeal from the United States Bankruptcy |
| GARMAN TURNER GORDON LLP., | ) | Court for the District of Nevada |
| | ) | |
| Appellee. | ) | Bk No.: 15-14145-BTB |
| | ) | |

Pending before the Court is the bankruptcy appeal of *Fann Contracting, Inc. v. Garman Turner Gordon, LLP*, Case No. 2:19-cv-00716-GMN.  Fann Contracting Inc. ("Appellant") filed an opening brief, (ECF No. 13), to which Appellee Garman Turner Gordon LLP ("GTG") filed an answering brief, (ECF No. 20), and Appellant replied, (ECF No. 25).  For the reasons discussed below, the Court **AFFIRMS** the underlying decision of the United States Bankruptcy Court for the District of Nevada.

## I.    BACKGROUND

This case arises out of Grand Canyon Ranch, LLC's ("the Debtor's") voluntary petition for relief under Chapter 11 of the Bankruptcy Code, filed on July 20, 2015.  Early on in proceedings, the Bankruptcy Court appointed Brian D. Shapiro to act as the Chapter 11 Trustee.  Mr. Shapiro then filed an application with the Bankruptcy Court to employ Appellee GTG as counsel to assist the Trustee pursuant to 11 U.S.C. § 327(a). (App. Employ GTG, ER Tab 4, ECF No. 14-4).  For compensation, GTG proposed a contingency fee structure of 35 percent "calculated based on any sums recovered, held, or distributed by the estate, including the value of in-kind or nonmonetary distributions." (*Id.* at ER 48).  That fee would rise to 40 percent if a reorganization plan were needed or 45 percent if the matter did not conclude until after a post-

1   trial motion or notice of appeal. (*Id.* at ER 47–48).  The Bankruptcy Court approved GTG's

2   employment on March 15, 2016. (Hr'g Tr., ER Tab 5, ECF No. 14-5).

3           Later in 2016, GTG proposed to the Bankruptcy Court a settlement between several

4   interested parties to the bankruptcy petition.  The settlement centered on the sale of a large area

5   of real estate near the Grand Canyon known as the "Frontier," control of which by the Debtor

6   was largely disputed. (Mot. Order Approving Settlement, ER Tab 6, ECF No. 14-6).  The terms

7   of this potential settlement were that the "Canyon Rock Parties"[1] would waive all claims to the

8   Frontier and provide a $780,000 cash payment to the Bankruptcy Estate, after which the

9   Frontier would be sold to an entity of the Canyon Rock Parties' choosing free and clear of all

10  encumbrances. (*Id.*).

11          After prompting by the Bankruptcy Court to achieve a more global settlement, GTG

12  negotiated a second settlement and sought the Bankruptcy Court's approval in April 2017.

13  (Mot. Order Approving Settlement, ER Tab 7, ECF No. 14-7).  This second settlement involved

14  the "Mared Parties"[2] and the Canyon Rock Parties, and the terms involved a payment of $1.75

15  million to the Estate upon closing.  In exchange for the payment, the Trustee would transfer to

16  Mared: (i) the Frontier property, "free and clear of all liens, claims, and encumbrances,

17  expressly including the Disputed Lease" and (ii) all of the Estate's remaining assets, including

18  any of the Estate's personal property located on the Frontier, with the exception of the Estate's

19  claims involving Appellant and Jim Barnes. (Order Approving Settlement, ER Tab 15, ECF

20  No. 15-3).  With that $1.75 million payment, $900,000 would be paid to the Canyon Rock

21

22

23  [1]  The Canyon Rock Parties refers to various entities with interests related to the Frontier property: Canyon Rock, LLC ("Canyon Rock"), Canyon Land Holdings, LLC ("Holdings"), Oriental Tours d/b/a Oriental Tours, Inc. ("OTI"), Canyon Ranch Adventures, LLC ("Adventures"), and "certain principals and agents . . . including

24  Yvonne Tang, Theodore Q. Quasula, Piper Hernandez, and Bart P. Mackay." (Mot. Order Approving Settlement, ER Tab 6, ECF No. 14-6).

25

[2] The Mared Parties includes Mared, LLC ("Mared") and its principals, Marios Savvides, Gina Savvides, Edward Frymer, and Madeline Frymer. (Op. Brief at 5, ECF No. 13).

1 | Parties as an "allowed secured claim." (*Id.*).  The Bankruptcy Court approved this second

2 | settlement on August 23, 2017, and no party appealed that decision. (*Id.*).

3 |       Following the Bankruptcy Court's approval of the second settlement, on November 28,

4 | 2017, GTG filed an application requesting fees and expenses in the amount of $590,836.93

5 | (including a voluntary reduction of fees by $50,000.00) based on the 35 percent contingency

6 | fee structure of employment. ("First Fee Notice and Application"). (First Fee Notice and

7 | Application, ER Tab 16 at ER 371, ECF No. 15-4).  But Appellant objected to that requested

8 | fee, asserting that the First Fee Notice and Application was procedurally improper, calculated

9 | pursuant to a misguided base computation, and based upon representations that render the fee

10 | award improvident.  The Bankruptcy Court overruled Appellant's objection and approved

11 | GTG's First Fee Notice and Application.  Appellant then appealed that approval to this Court

12 | on December 27, 2017.  On appeal, this Court found that the bankruptcy court erred by not

13 | considering the appropriateness of GTG's compensation award through 11 U.S.C. § 330, which

14 | warranted vacating the Bankruptcy Court's approval of fees and remand for additional

15 | consideration. *See Fann Contracting, Inc. v. Garman Turner Gordon LLP*, 593 B.R. 625, 636

16 | (D. Nev. 2018) (holding GTG "was retained pursuant to § 330," and on remand "the

17 | bankruptcy court may grant such fees as it deems appropriate pursuant to the standard set forth

18 | in § 330.").

19 |       While on remand, the Bankruptcy Court held an evidentiary hearing to review GTG's

20 | requested fees and expenses for reasonability under § 330.  The Bankruptcy Court ultimately

21 | approved GTG's requested 35-percent contingency fee based on the $1.75 million second

22 | settlement, amounting to fees for GTG of $612,500.00. (Order Approving GTG's Application

23 | for Contingency Fee, ER Tab 29, ECF No. 18-7).  The Bankruptcy Court further awarded

24 | expenses incurred by GTG in the amount of $32,522.85. (*Id.*).  Appellant timely appealed that

25 | approval order to this Court on April 25, 2019. (Not. Appeal, ECF No. 1).

1    ## II.    STANDARD OF REVIEW

2          This Court will not disturb the Bankruptcy Court's award of attorney's fees absent a

3    finding that the Bankruptcy Court "abused its discretion or erroneously applied the law." *See,*

4    *e.g.*, *In re Reimers*, 972 F.2d 1127, 1128 (9th Cir. 1992); *In re Mohsen*, 506 B.R. 96, 103 (N.D.

5    Cal. 2013).  In other words, reversal occurs when the Court has a "definite and firm conviction

6    that the bankruptcy court committed clear error in the conclusion it reached after weighing all

7    of the relevant factors." *In re Mohsen*, 506 B.R. at 103 (quoting *In re Eliapo*, 468 F.3d 592, 596

8    (9th Cir. 2006)).  Unless the Bankruptcy Court "applied the wrong legal standard or its findings

9    of fact were illogical, implausible, or without support in the record," the Court "must affirm."

10   *McGrane v. Howrey, LLP*, No. 14-cv-05111-JD, 2015 WL 6126792, at *3 (N.D. Cal. Oct. 19,

11   2015), *aff'd sub nom. Matter of Howrey LLP*, 698 F. App'x 881 (9th Cir. 2017) (citing

12   *Rodriguez v. Disner*, 688 F.3d 645, 653 (9th Cir. 2012)).

13   ## III.    DISCUSSION

14         In this appeal, Appellant argues that the Bankruptcy Court's analysis of GTG's

15   attorney's fees and expenses under 11 U.S.C. § 330 was "fundamentally flawed" as a matter of

16   both law and fact. (Op. Brief at 10, ECF No. 13).  The Bankruptcy Court erred as a matter of

17   law, according to Appellant, by not considering the "results achieved"—particularly, that GTG

18   would recover the full amount of its requested fees and expenses while unsecured creditors like

19   Appellant would receive no distribution. (*Id.* at 13–22).  Appellant also claims that it was "per

20   se unreasonable" for the Bankruptcy Court to allow GTG's contingency fee to include the value

21   of property already owned by the Estate. (*Id.* at 22–24).  Next, Appellant argues that the

22   Bankruptcy Court erred by allowing GTG to justify its requested contingency fee with

23   unnecessary work and time spent defending its application for fees. (*Id.* at 24–33).  Last,

24   Appellant claims the Bankruptcy Court erred by failing to reduce GTG's fees based on GTG's

25   purported breaches of ethical obligations and conflicts of interest. (*Id.* at 33–41).

1    As explained below, the Court finds that the Bankruptcy Court considered the applicable

2    factors for a reasonability analysis under § 330 and did not abuse its discretion in awarding

3    GTG its expenses and 35 percent contingency fee.  The Court accordingly affirms the

4    Bankruptcy Court's decision.

5    **A.  Considering the Results Achieved**

6    11 U.S.C. § 330(a) provides several factors to guide a bankruptcy court's analysis on the

7    reasonable amount of attorney's fees for a professional employed in a Chapter 11 case, such as:

8    the time spent on services; the rates charges for such services; whether the services were

9    necessary to the administration of, or beneficial at the time at which, the service was rendered

10   toward the completion of the case; and whether the services were performed within a

11   reasonable amount of time commensurate with the complexity, importance, and nature of the

12   problem, issue, or task addressed. *See* 11 U.S.C. § 330(a)(3).  Alongside those flexible factors,

13   § 330 becomes resolute in § 330(a)(4)(A), instructing that a court "shall not allow

14   compensation" for "unnecessary duplication of services" or services that were not "reasonably

15   likely to benefit the debtor's estate" or "necessary to the administration of the case." 11 U.S.C.

16   § 330(a)(4)(A).  Moreover, a professional like GTG hired to assist a bankruptcy trustee has a

17   duty to scale back its services based on the reasonable expected outcome. *In re Auto Parts*

18   *Club*, Inc., 211 B.R. 29, 34 (B.A.P. 9th Cir. 1997).

19   Appellant argues that the Bankruptcy Court's § 330 analysis was flawed as a matter of

20   law because it failed to consider how approving GTG's 35 percent contingency fee would mean

21   over $600,000.00 in recovered fees while Appellant as an unsecured creditor would not recover

22   any amount under the second negotiated settlement. (Op. Brief at 21) ("This result cannot be

23   considered beneficial as a matter of law.").  Appellant argues that had the Bankruptcy Court's

24   § 330 analysis properly considering this disparate result, it would have reduced GTG's fees and

25   expenses to provide funds for unsecured creditors.

1    Support for Appellant's position comes from *In re Auto Parts Club, Inc.*, where the

2  Bankruptcy Appellate Panel for the Ninth Circuit affirmed a reduction in attorney's fees on the

3  ground that "[t]he [bankruptcy] estate should not be consumed by professional fees, especially

4  where the unsecured creditors receive no distribution." 211 B.R. at 35.  In that Chapter 11 case,

5  a law firm representing an unsecured creditors committee sought $137,033.50 in fees and

6  $11,134.94 in costs, though the firm had already received $93.514.55 pursuant to an interim fee

7  order. *Id.* at 30–31.  The bankruptcy court found this final requested fee to be unreasonable,

8  because the firm "failed to scale back its services based on the reasonable expected recovery

9  [for the Estate]." *Id.* at 32, 34–35.  Specifically, even after it became clear during bankruptcy

10  proceedings that a sale of the debtor's assets would amount to much less than the firm

11  expected—resulting in no recovery for unsecured creditors—the firm continued to run up fees

12  and costs pursuing a more lucrative sale price. *Id.* 32, 35–36 ("58% of the fees (or $79,060) was

13  incurred after the decision was made to sell the debtor's busines.").  And on appeal, the

14  Bankruptcy Appellate Panel agreed with the lower court's decision to reduce the firm's fees

15  based on unnecessary work resulting in a disparity between the firm's requested compensation

16  compared to unsecured creditors. *Id.* at 35–36 (ultimately remanding the case because the final

17  reduction amount required additional factual findings).

18    However, contrary to Appellant's argument, here the record below shows that the

19  Bankruptcy Court's § 330 analysis *did* consider how GTG would recover more than

20  $600,000.00 in fees while Appellant as an unsecured creditor would not receive a distribution

21  under the second settlement's terms.  Not only did the Bankruptcy Court recognize that

22  disparity, the Bankruptcy Court provided reasons why it was not fatal to GTG's request for the

23  35 percent contingency fee.  For example, the Bankruptcy Court noted that GTG's settlement

24  negotiations ensured a reduction in the unsecured creditor pool by $13 million. (Hr'g Tr. at ER

25  876, ECF No. 18-6).  The Bankruptcy Court also discussed how GTG's efforts in negotiating

1    the second settlement enabled Appellant to obtain $200,000.00 to pay unsecured creditors—

2    "thereby providing a greater return to all unsecured creditors, including [Appellant's] dominant

3    unsecured claim." (*Id.* at ER 877) (noting that Appellant was able, "through its own efforts, to

4    obtain $200,000 to pay unsecured creditors under its own plan," which "would have been for

5    nought [sic] absent [GTG's] efforts in reducing the unsecured creditor pool."). On appeal,

6    Appellant does not point to evidence showing these factual findings to be clearly erroneous;

7    and the record supports them.

8         Accordingly, unlike *In re Auto Parts Club, Inc.*, this is not a case where an employed

9    professional neglected the interests of unsecured creditors when securing a resolution. Nor is

10   this a case where the professional ran up costs and drained funds even after it became

11   reasonably apparent that a better result was unlikely to occur, as discussed below in Section C.[3]

12   The Bankruptcy Court's § 330 analysis thus does not fail from the outset or as a matter of law

13   for ignoring the "results achieved," and the Court does not find clear error in the Bankruptcy

14   Court's decision to not reduce GTG's fees based on the results alone. *Cf. In re Auto Parts Club,*

15   *Inc.*, 211 B.R. at 32 ("We will not reverse an award of fees unless we have a definite and firm

16   conviction that the bankruptcy court committed clear error in the conclusion it reached after

17   weighing all of the relevant factors.").

18        **B. Award of Fees Considering Property Already Owned by the Estate**

19        Aside from considering the results achieved, Appellant contends that the Bankruptcy

20   Court committed per se error by allowing GTG's contingency fee to be paid from the value of

21   property already owned by the Estate—specifically, "the sale of the southern Parcel [of the

22   Frontier property]." (Op. Brief at 22–23). GTG argues in response that ownership of all

23

24   [3] The significant actions that GTG continued to perform after negotiating the second settlement concerned
     defending its contingency fee request against Appellant's challenges and resolving the already-ongoing litigation
25   in state court about the "Barnes Lease." The below discussion in Section C addresses whether these actions were
     compensable under § 330 and whether the Bankruptcy Court abused its discretion in awarding GTG's fees after
     weighing all the applicable § 330 factors.

1   property or potential property of the estate "was in dispute and the subject of litigation" since

2   the beginning of this matter. (Resp. at 13).

3        Under the facts of this case, the Court does not find that the Bankruptcy Court

4   committed per se error by allowing GTG's contingency fee to include the value of property

5   apparently already owned by the Estate.  Appellant cites no authority (and the Court did not

6   find any) to support the argument that professional fees cannot stem from the value of property

7   already owned by the Estate.  11 U.S.C. §§ 327, 328, and 330 provide no rule or guidance

8   against that possibility.  As Appellant recognizes, contingency fees are beneficial when

9   "inherent risks" exist in recovery and there are "a lack of resources" to continually fund the

10  litigation. (Op. Brief at 23) (citing *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 331

11  (Bankr. D. Md. 2000)).  Allowing a contingency fee to include the value of property already

12  owned by the estate may certainly mitigate a risk of complete non-recovery.  But such an

13  arrangement does not appear per se impermissible in circumstances like this case.  As the

14  Bankruptcy Court found, it was not clear from the start of proceedings whether the Estate held

15  any property or assets free and clear, and the southern Parcel was only a portion of funds used

16  to calculate GTG's contingency fee award. (Hr'g Tr. at ER 871–72, 877, ECF No. 18-6).[4]

17        **C.  Weighing the Appropriate Factors Outlined by 11 U.S.C. § 330**

18        The next, overarching issue in this appeal is whether the Bankruptcy Court abused its

19  discretion when conducting its § 330 reasonableness review and awarding GTG its 35 percent

20  contingency fee amounting to $612,500.00 and expenses of $32,522.85.  In awarding that fee,

21  the Bankruptcy Court considered the following unique circumstances surrounding this case,

22  among others: GTG accepted the case knowing the "risk of not getting paid and lost the

23  _____

24  [4]  Appellant contends that Arizona title documents show the Estate owned the Southern Parcel, (Op. Brief at 6),
    and there is support for that in the record. (Dep. Tr. at ER 1033, ECF No. 19-10).  However, GTG and Appellant

25  heavily disputed the value, if any, of the Southern Parcel.  Appellant has not provided evidence of an evaluation
    worth more than zero. (*See id.* at ER 1034–35) (showing questions and answers about the Southern Parcel's
    value not being more than zero when considering the claims, liens, and encumbrances against the Parcel).

1    opportunity cost of utilizing these substantial hours in generating fees in other matters"; GTG

2    successfully negotiated a global settlement, thus avoiding likely "several years of litigation";

3    and the difficult issues and parties in this case. (Hr'g Tr. at ER 878–81).  One consideration that

4    reinforced the reasonableness of GTG's contingency fee was that GTG spent more than 1,500

5    hours on this case while charging a below market "blended hourly rate of $387.53," which

6    "would result in a payment of $606,000." (*Id.* at ER 878–79).  To the Bankruptcy Court, that

7    showed how an hourly fee rate would correlate to a similar amount of attorney's fees as the

8    requested 35 percent contingency fee. (*Id.*).

9         Appellant's position below and now on appeal is that even though GTG sought

10   compensation on a contingency fee basis, GTG still needed to provide time sheets showing how

11   it spent time worth its entire requested fee.  Appellant then points out that GTG's time sheets

12   submitted to the Bankruptcy Court showed several work entries that were not compensable

13   under § 330 because the work did not benefit the Estate and was unnecessary. (Op. Brief at 24–

14   33).  These purportedly non-compensable work entries consist of $56,963.00 for time GTG

15   spent defending its attorney's fees application, $124,000.00 for time GTG spent in state court

16   litigation about the "Barnes Lease," as well as around $23,000 for time GTG spent dealing with

17   the "Fann litigation" and researching and drafting motions not filed with a court. (*Id.*).

18   Moreover, according to Appellant, GTG's time entries that were compensable under § 330 did

19   not amount to roughly $612,000 in attorney's fees for this matter.  So Appellant contends that

20   the Bankruptcy Court abused its discretion by not deducting GTG's requested contingency fee

21   by the amount of billing entries that were not compensable under § 330.

22        As detailed below, the Court disagrees with Appellant's contention that the Bankruptcy

23   Court erred in failing to reduce GTG's contingency fees based on purportedly non-

24   compensable work.

25

1    11 U.S.C. § 330(a) does not create a retrospective standard where services are only

2  compensable if they result in a material benefit to the estate.  Instead, "a professional need

3  demonstrate only that the services were reasonably likely to benefit the estate at the time

4  rendered." *In re Garcia*, 335 B.R. 717, 724 (B.A.P. 9th Cir. 2005).  Moreover, while

5  bankruptcy courts often use the "lodestar" method as a guide to determine a presumptively

6  reasonable amount of attorney's fees, such an approach is not mandatory under § 330. *See, e.g.*,

7  *In re Kudrave*, No. 2:17-BK-17577-RK, 2019 WL 5688157, at \*9 (Bankr. C.D. Cal. Nov. 1,

8  2019); *In re Eliapo*, 468 F.3d at 598.  And even when used, the lodestar method acts as a mere

9  "complement [to § 330(a)'s] statutory factors." *In re Kudrave*, 2019 WL 5688157, at \*9.

10   Here, because the Bankruptcy Court's decision relied in part on the lodestar method, the

11  Court's appellate review will too.  The below discussion accordingly considers whether

12  Appellant correctly objects to certain blocks of time in GTG's services, and, if so, what a

13  presumptively reasonable lodestar fee would be based on only compensable hours.  The Court

14  then determines if the Bankruptcy Court abused its discretion by awarding fees more than the

15  lodestar amount after considering all factors from § 330(a). *See In re Buckridge*, 367 B.R. 191,

16  202 (Bankr. C.D. Cal. 2007) ("[A] court is permitted to adjust the lodestar up or down using a

17  'multiplier' based on the criteria listed in § 330 and its consideration of the *Kerr* factors not

18  subsumed within the initial calculation of the lodestar.").

19   Addressing first the $124,000 for time GTG spent litigating in state court about the

20  Barnes Lease, the Court does not find that the Bankruptcy Court abused its discretion in

21  considering the litigation as necessary or beneficial to the Estate for purposes of § 330.

22  Appellant's argument is that the second negotiated settlement transferred the Northern Parcel of

23  the Frontier into the Estate then out of the Estate to make it "free and clear" for resale. (Op.

24  Brief at 30–31).  Because the Estate had control of the entire Frontier property at one point

25  during that transfer process, Appellant argues, the Trustee "simply needed to reject the Barnes

1   Lease" to render the related state court litigation moot. (*Id.*).  However, the record does not

2   support the feasibility of Appellant's proposed resolution.[5]  GTG provided evidence showing

3   that the Estate did not have the ability to reject the Barnes Lease, that doing so would

4   "increase[] the pool of unsecured claims to be asserted against this estate," and that the second

5   settlement considered these facts. (Hr'g Tr. at ER 735–36) (stating "the settlement

6   contemplated that the estate would litigate the resolution of the Barnes lease in state court");

7   (*id.* at ER 763–65) (testimony that the Estate was neither the "lessor or the lessee" and thus

8   could not simply reject the Barnes Lease); (*id.* at ER 765); (*id.* at ER 875–76, 878–79)

9   (Bankruptcy Court finding that Appellant "did not present any evidence disputing either Mr.

10  Garman's contentions or the declaration of the counter-party to the settlement . . . that the

11  settlement would not have been possible via the structure proposed by [Appellant]."). Indeed,

12  the Bankruptcy Court found the second settlement's terms—including the continuation of

13  litigation in state court about the Barnes Lease—fair, equitable, and in the "best interests" of

14  the Estate as a whole. (Order Granting Motion to Approval Settlement at ER 346–52, ECF No.

15  15-3).  Appellant did not appeal the Bankruptcy Court's approval of that second settlement, so

16  the specific findings about its terms being in the best interests of the Estate are not reviewable

17  now. (*See id.*).  Accordingly, the Court does not find clear error with the Bankruptcy Court

18  viewing fees spent on the Barnes Litigation as beneficial to the Estate and compensable for

19  purposes of § 330.

20      By contrast, the Court agrees with Appellant that GTG's time spent defending its First

21  Fee Notice and Application is not compensable under § 330(a). *See Baker Botts L.L.P. v.*

22

23  _____

24  [5]  Even if Appellant's proposed resolution of the Barnes Lease were feasible, rejection of the Lease could occur only after GTG secured the second settlement.  Yet Appellant requests a reduction in the amount of *all* fees associated with litigating the Barnes Lease, not just the amount of fees spent continuing to litigate after

25  negotiating the second settlement.  Moreover, Appellant does not address or provide support for the ability to simply terminate state proceedings about the Barnes Lease once the second settlement occurred; and thus, the Court on appeal has no basis to find that as a possibility.

1    *ASARCO LLC*, 576 U.S. 121, 135 (2015).  Also, GTG's briefing does not address the

2    compensability of $23,000 for time spent relating to the Fann litigation as well as researching

3    and drafting motions not filed with a court.  But even if all fees for these two categories of

4    work were not compensable under § 330(a), thereby reducing the presumptively reasonable

5    lodestar to roughly $526,037.00, the Bankruptcy Court provided many findings supported by

6    the record to justify still awarding full recovery under the 35 percent contingency fee

7    arrangement.  Specifically, GTG had spent three years litigating the matter "all while funding

8    expenses and without payment"; its blended hourly rate was "well below what would have been

9    the rates for most of the people working on this case"; and GTG ensured a "very successful

10   conclusion to the case" which surprised the Bankruptcy Court, who from the beginning

11   believed that recovery by any party was unlikely. (Hr'g Tr. at ER 868, 871–74, 876, 879–81).

12   The Bankruptcy Court also considered how all applicable factors under § 330(a) further

13   supported GTG's requested contingency fee and expenses. (*Id.* at ER 878–80).  There is ample

14   support in the record for the Bankruptcy Court's decision; and thus, the Court does not find that

15   the Bankruptcy Court abused its discretion when concluding that GTG's requested fees and

16   expenses are reasonable under § 330. *See In re Cervantes*, No. 18-10306-B-13, 2020 WL

17   1580277, at *5 (Bankr. E.D. Cal. Mar. 31, 2020) ("In employing the fee setting criteria of

18   § 330(a), the bankruptcy judge is accorded wide discretion."); *In re Roderick Timber Co.*, 185

19   B.R. 601, 606 (B.A.P. 9th Cir. 1995). *Cf. In re Mkt. Ctr. E. Retail Prop., Inc.*, 730 F.3d 1239,

20   1250 (10th Cir. 2013) (explaining that "a bankruptcy court has discretion in determining how

21   much weight to assign each factor and in determining the reasonableness of a fee . . . .").

22          **D.  Conflict of Interest and Ethical Duty**

23          Lastly, Appellant argues that GTG operated under a conflict of interest and breached its

24   ethical duties by structuring the second settlement so that it "did not provide optimal value to

25   the Estate or its creditors" and instead benefitted GTG by "running the $900,000 payment

1   through the Estate and ballooning the base for GTG's contingency fee." (Op. Brief at 34–35,

2   39–40) (arguing that the second negotiated settlement should have been structured in a way that

3   the $900,000 would be paid to the Canyon Rock Parties outside of the bankruptcy and

4   $850,000 would come into the Estate, without determination of the GTG fee claim, resulting in

5   a much larger distribution to creditors).  Appellant claims that the Bankruptcy Court should

6   have reduced GTG's fee based on these actions being self-interested. *Id.*

7       Appellant's current arguments and cited authorities essentially mirror those previously

8   raised in the first appeal to this Court about GTG's attorney's fees and expenses. *See Fann*

9   *Contracting, Inc.*, 593 B.R. at 634.   The Court finds no reason to depart from its prior

10  conclusion that Appellant has not articulated a conflict of interest or a breach of ethical duty by

11  GTG and, therefore, the Bankruptcy Court did not clearly err in finding the same. (Hr'g Tr. at

12  ER 873–877).  As explained in this Order, the record does not support Appellant's argument

13  that GTG structured the second negotiated settlement to inflate its fees. (*Id.*).  What is more,

14  Appellant did not appeal the Bankruptcy Court's approval of the second settlement—where the

15  Bankruptcy Court found that the settlement's terms were fair, equitable, and in the "best

16  interests" of the Estate as a whole. (Order Granting Motion to Approval Settlement at ER 346–

17  52, ECF No. 15-3).  The findings in that order are now final and not at issue in this appeal.

18  **IV.   CONCLUSION**

19      **IT IS HEREBY ORDERED** that the April 15, 2019 Order of the United States

20  Bankruptcy Court for the District of Nevada is **AFFIRMED.**

21      **DATED** this __27__ day of July, 2020.

22

23

24                                              _____
                                                Gloria M. Navarro, District Judge
                                                United States District Court
25